(No. 30519.—

MINNIE JORDAN *et al.*, Appellants, *vs.* DEWEY McGREW *et al.*, Appellees.

*Opinion filed May 20, 1948.*

276

SMITH, McCOLLUM & RIGGLE, of Flora, and J. F. Mc-
COLLUM, of Louisville, for appellants.

E. HAROLD WINELAND, and MEYER & MEYER, both of
Flora, for appellees.

Mr. JUSTICE SIMPSON delivered the opinion of the
court:

This appeal is prosecuted to reverse a decree of the
circuit court of Clay County entered in a partition suit
instituted by appellants to divide 74 acres of land in Clay
County and 20 acres in Wayne County, among certain
persons as heirs-at-law of Amanda Myers, who died Sep-
tember 8, 1946. A freehold being involved, the appeal
comes directly here.

Appellee Dewey McGrew, a defendant to the complaint, filed answer and cross complaint. A motion for an order of court permitting Grace McGrew, his wife, and their children to intervene as defendants and cross claimants was allowed. Other defendants, heirs-at-law of Amanda Myers, were given leave to become plaintiffs, and on motion of plaintiffs the answers of Dewey McGrew and the intervening defendants and cross plaintiffs were dismissed. Amended answers and counterclaims were filed, to which motions to strike were filed and overruled. W. F. Downard was made defendant as administrator of the estate of Amanda Myers. At the time the case went to trial all of the heirs-at-law of Amanda Myers were plaintiffs, appellants here. Dewey McGrew, Grace McGrew, his wife, and their children were cross plaintiffs and are the appellees here. In addition to the real estate sought to be partitioned, the deceased left considerable personal property. Answers were filed to the counterclaims and the main issue joined on the pleadings was whether Amanda Myers, widow of Anthony Myers, died intestate or whether her destroyed will should be admitted to probate and allowed to control the disposition of her property.

Anthony Myers and Amanda Myers executed mutual reciprocal wills on May 15, 1937, in and by which Anthony Myers willed his property to Amanda Myers and provided that if she should not be living at the time of his death, then it should go to Grace M. McGrew for life with remainder at her death to her children in equal shares. The will of Amanda Myers gave her property to her husband, Anthony Myers, and provided that if Anthony Myers should not be living at the time of her death, then it should go to Grace M. McGrew for life and and at her death to her children in equal shares. Both wills contained a paragraph which recited, "I make this my will, as above stated, to said Grace M. McGrew, in the event of my husband's [wife's] prior death, on account of the

care, help and attendance which she has heretofore given to myself and my said husband [wife] and the same care, help and attendance which she shall hereafter give to me and my said husband [wife], during our lives, and to recompense her therefor, so far as we can do so." Both wills appointed Dewey McGrew as executor. Anthony Myers died May 7, 1944, and his will was admitted to · probate by the county court of Clay County. Amanda Myers accepted the devises and bequests under the mutual will of her husband, Anthony Myers. On November 14, 1945, Amanda Myers, in the presence of two witnesses destroyed her mutual will, executed on May 15, 1937, by burning it. The claim of Dewey McGrew and Grace Mc-Grew for services rendered, alleged in their count III, was reserved by stipulation of the parties and is not in issue here.

The case was heard by the court and the taking of testimony required several days. On August 1, 1947, the court entered a decree in favor of appellees, Grace McGrew and her children and against the appellants, finding that Amanda Myers duly and properly executed her will on May 15, 1937; that following the death of Anthony Myers, Amanda Myers attempted to destroy her will by burning; that said wills of Amanda Myers and her husband were mutual, duly executed, and in accordance with an agreement and understanding between the two, and that Amanda Myers was estopped upon the death of Anthony Myers from revoking her will and her attempt so to do was a nullity and that the equities are with counterclaimants Grace McGrew and her children, Vivian, Robert, Jewell, Gerald, Betty and Dewey McGrew. The court ordered that the said will of Amanda Myers be admitted to probate and that Dewey McGrew be appointed executor; that letters issue under the seal of the circuit court to him; that the administrator, Frank Downard, deliver to Dewey McGrew, as such executor, all property held by him as administrator,

and that the property described in the counterclaim be confirmed as the property of Grace McGrew for life and at her death to her children in fee in equal shares.

Of the ten errors assigned by appellants for reversal four are urged in their brief and argument and are (a) that the jurisdiction of a proceeding to establish and probate a lost or destroyed will is vested solely in the county court and the circuit court has no original jurisdiction; (b) appellees, cross plaintiffs Grace McGrew and her children, were not necessary or proper parties to this suit and their intervening answer and counterclaim should have been dismissed on appellants' motion; (c) that to entitle a lost or destroyed will to probate, two witnesses must prove that they saw the testator sign the will or acknowledge the same to be his act and deed and they must swear that they believed the testator was of sound mind and memory at the time of acknowledging the same, and that the requirements are not changed by the death or removal of the witnesses, such death or removal merely changing the form of proof; (d) that in order to make mutual wills irrevocable, proof must be made of a contract not to revoke and a consideration to support it, and such proof must be made *aliunde;* that such contract must be certain and definite in all its parts, founded upon an adequate consideration and established by clear and convincing testimony.

Mutual wills generally are not of themselves sufficient evidence of a contract, and proof of the contract and the consideration to support it must be made *aliunde.* To render mutual wills operative as being made one in consideration of the other, and for such wills to become irrevocable as joint wills made under contract, the contract must be certain and definite in all its parts, it must be mutual, founded upon an adequate consideration, and established by the clearest and most convincing evidence. Unless it is so proved, neither would the wills be considered joint, nor will specific performance be awarded to complete the

contract. (*Frese* v. *Meyer*, 392 Ill. 59.) In the *Frese case*, the only evidence offered to support the two wills was that on the day they were made the husband remarked, "I made ma happy today. We made our wills together. * * * Everything goes to ma, and then to the children;" and the wife said, "That's right, and if I should go first, it goes to pa and then to the children." One other witness who had just made her will testified to a conversation with the husband, in which he said, "We had ours made last week and we agreed that we was going to—if I die my wife gets everything, and if she dies the children gets everything." In passing upon this testimony we held there was absolutely nothing to indicate there was any agreement that either of the parties would not at any time have the right of revocation.

To justify the decree entered in this case, it must appear from the evidence that there is no doubt that a contract was made, and that its terms have been clearly and conclusively established. *Chambers* v. *Appel*, 392 Ill. 294, 298, and cases cited.

In the *Chambers case* we held the facts were sufficient to support the findings that there was a verbal agreement between the deceased and the appellees whereby they were to care for her and her mother as long as either should live, and in consideration of such service the deceased was to will them all her property, both real and personal; that the appellees fully performed their part of the agreement, and that the facts come within the rule announced in cases such as *Mayo* v. *Mayo*, 302 Ill. 584, *Aldrich* v. *Aldrich*, 287 Ill. 213, where oral contracts were specifically enforced.

The evidence in this case shows that appellant Minnie Jordan took her daughter, Grace Jordan, now Grace Mc-Grew, to the home of Anthony and Amanda Myers when she was about eleven years old. From that time on she lived with the Myers's and was treated and considered as if she were their child. She did housework, gathered eggs

and did chores, and in the summer time worked in the field and helped in the harvest, putting up hay and doing any other work about the place that was required of her. The testimony shows that Mr. Myers was a man who believed that everybody around him should work and that Grace did such work as she was told to do. She continued in the home until she married at about the age of 19 years. After she married Dewey McGrew, she and her husband continued to help the Myers's with their farm work and Grace continued to help Mrs. Myers about the housework when needed. Some thirty or more witnesses testified for appellees. The testimony of all these witnesses related to conversations of the Myers's concerning Grace in which they repeated that they intended to leave what they had to Grace and after they had made their wills in 1937 they told many witnesses that they had everything fixed so that Grace would get all their property when they were both gone.

Laura Jurgenson testified that Amanda Myers told her that she and Tony had an agreement. That Tony made a will and left everything to Mandy. He wanted Mandy to leave everything at her death for Grace. This witness also testified, without objection thereto, that Dewey Mc-Grew and Grace McGrew had stated to her that they expected to get the place in return for their agreement in taking care of her.

J. P. Jurgenson, husband of Laura Jurgenson, testified that in the summer of 1945 he offered to buy the farm from Amanda Myers and pay her cash for it so she could move to town; that she said, "No, I'm not going to sell it. I am going to stay right here until I die and when I die Grace is going to have the place;" that she said, "I've got a will made;" that about two weeks before Amanda died, he and his wife were there and Mandy said, "I wish I had Grace up here. I can't get up if anything goes wrong. You go down and get Grace." They went down and

brought Grace, and Amanda Myers said that Grace never got anything for what she did but she always paid Minnie Jordan for what she did.

Frank Berry testified that he had known Grace since childhood and he had seen her around Tony and Mandy's place and that Grace was their mainstay; that she helped Mandy and that Mandy told him that everything they had would go to Grace and Dewey; that a short time before Mandy died he had a conversation with her in which she said that she had destroyed her will and that she was sorry that she did it, but she had fixed a second one back as near as she could. Mrs. C. W. McVeigh testified that Mandy said she did not want to spend her money freely because she wanted to save it for Grace and Dewey. The testimony of all the other witnesses for appellees was to the same general effect that Anthony Myers in his lifetime and Amanda Myers, after his death, up until the fall of 1945, told all their neighbors and friends that they had made wills and that when they both died, Grace McGrew would get all their property.

There is some evidence that Dewey McGrew and Amanda Myers had some difference of opinion in regard to some matters pertaining to the settlement of the estate of Anthony Myers and there is also evidence that Amanda Myers believed that some persons carrying lights were prowling about her place and attempting to frighten her and that on one occasion she mentioned to George Myers, brother of Anthony Myers, that she thought Dewey McGrew was prowling about the place. Newton Branson, the undertaker with whom Mandy made arrangements for her funeral about ninety days before she died, testified that Mandy told him she could not understand why Dewey McGrew would be doing that. There is no evidence that Dewey McGrew ever prowled about her place at night. There is evidence that there were no prowlers, but that it was Amanda Myers's imagination; that the lights which

she saw were the lights from a neighbor's window and that when the neighbor was told about it he pulled his blinds down and she never saw any more lights and never complained of any more prowlers.

The evidence shows Grace's mother, Minnie Jordan, spent a great deal more of her time at Amanda Myers's home after Mr. Myers died than she ever did before, and that W. F. Downard visited Amanda quite frequently the last years of her life and was present with Clarence T. Smith, attorney, on November 14, 1945, when Amanda Myers burned her will. W. F. Downard on occasions took whiskey to her which he said she used for medicine.

Grace McGrew testified that she was not welcome at the Myers's home after August, 1944. However, the evidence showed that she and Dewey continued to help Mrs. Myers and that during the life of Mr. Myers and up to November 29, 1944, Grace McGrew kept certain deposit certificates for Amanda Myers aggregating about $6000, and that in November, 1944, at Amanda's request, Grace delivered all of the certificates over to her. Grace's name was on one of the certificates. Grace said that Mrs. Myers requested the certificates because she said that she and Frank Downard wanted to see a lawyer. These circumstances, together with her advanced age and failing health, may have contributed to her change of mind toward Grace and Dewey and consequently led to her act of destroying her will. Whatever that motive was, however, she expressed regret afterwards and wrote letters and cards to them to come by and help her, which they did whenever called upon. The evidence establishes that there was a verbal agreement between Anthony Myers and Amanda Myers and Grace McGrew whereby in consideration of what Grace had done and was to do in helping them, they were to make their mutual wills giving the property to Grace McGrew for her life and the remainder to her children, and that she performed her part of the agreement.

On the question of the proof of the last will and testament of Amanda Myers, we have the testimony of Arthur Dunegan that he went with Amanda and her husband to Judge Reaugh's office in the Ben C. Reaugh building; that Tony and Mandy Myers and he went in; that he listened and that they wanted it fixed up from one to the other and then to Grace McGrew and that Dewey McGrew was to be the executor; that he left before the wills were type-written, but after that he read both of the wills, and that the difference was the signature of Tony's name on one and the signature of Mrs. Myers on the other; that Ben Reaugh's name was written in handwriting as a witness and that it looked the same on both wills and that he saw Sprig Reaugh's name as a witness on both but did not remember his initials; that the same was in handwriting, and that the date on the wills was the same; that he had a conversation with Tony and Mandy Myers and that they said, "I've got it fixed up iron-clad;" that this occurred in 1937, and both wills were in one envelope and Mr. Myers gave them to Charlie Hemphill and that he never saw the original wills after he put them in the envelope.

W. F. Downard testified that in the spring of 1945 Mandy gave him her will for safekeeping and said she wanted to make another will later on, and that he kept it until about November 1, 1945, and read it one time; that he was with Clarence T. Smith in the home of Mandy Myers in November, 1945, and was present when Amanda Myers put her will in the stove and gave Mr. Smith instructions about a new will. Clarence T. Smith testified that during two or three conversations in 1944 she showed him the copy of Tony Myers's will and her original executed will, and that he read them and that she told him she was dissatisfied with her will and asked him what to do about it; that in the late summer of 1945 he had a conversation with her, and that he again read her original executed will and explained to her what would happen to

her property by leaving that will and he advised her that if she did not want her property to go as provided in the will, that she should destroy it by tearing it up or burning it; that she left the office with the will in her purse with the understanding that she would give the matter further thought and come back to have a will drawn; that the next he knew was when Mr. Downard told him that Mrs. Myers desired that he come to her house to discuss the matter and that he and Mr. Downard drove out to her home and had a conversation on November 14, 1945. He said that she had the will, and that discussion followed and she brought up the subject of the old will and that he again advised her that if she died leaving it that way, the property would go as that will provided and that if the will were destroyed the property would go to her heirs-at-law, which would take care of the sister; that she then said in substance, "If I am going to do it, I had just as well do it now and get it out of the way;" that she then got out of her chair and threw the will in the stove and that he never prepared another will. He further testified, after an examination of appellee's Exhibit B, (the mutual will in question,) that according to his best recollection and judgment it was a true copy of the will of Amanda Myers which he read during her lifetime. Amanda Myers had declared this to be her will on a number of occasions and to different people and had also said that the paper which she threw in the stove was the will which she had executed on the same date that she and her husband went to the office of Judge Reaugh. It was signed by Amanda Myers and witnessed by two witnesses. We held, *In the Matter of Page,* 118 Ill. 576, that the declarations, written or oral, made by a testator after the execution of his will are, in the event of its loss, admissible not only to prove that it has not been cancelled but also as secondary evidence of its contents. In the case of *Anderson* v. *Irwin,* 101 Ill. 411, where a daughter of the deceased filed a bill to estab-

lish her father's will which her mother, the widow, declared she had burned, and which had been opened in the presence of and read by some of the members of the family, we held all that would be required of the complainant under the circumstances was to show in general terms the disposition which the testator made of his property by the instrument and that it purported to be his will and was duly acknowledged by the requisite number of witnesses. We said, "In view of all the facts, we think the maxim, *omnia praesumuntur contra spoliatorem*, may properly be applied to this case. In applying this maxim, the rule seems to be well settled that where one deliberately destroys, or purposely induces another to destroy, a written instrument of any kind, and the contents of such instrument subsequently become a matter of judicial inquiry between the spoliator and an innocent party, the latter will not be required to make strict proof of the contents of such instrument in order to establish a right founded thereon. In such case slight evidence will suffice." This rule was followed in *Hudson* v. *Hudson,* 287 Ill. 286. W. F. Downard testified that in November, when he and Mr. Smith went to the home of Mandy Myers, she had Mr. Smith read the will and he gave it back to her and she put it in the stove.

We now come to the appellants' contention that the appellees were not proper parties to this proceeding. Minnie Jordan, who originally brought the suit for partition, alleged that Amanda Myers died intestate. She knew Amanda had destroyed her mutual will which gave the property to Grace McGrew and her children. She made Dewey McGrew a defendant as a tenant. He answered the bill and filed a cross bill and requested an order granting Grace McGrew and their children leave to file intervening petitions. We held in *Hurlbut* v. *Talbot,* 273 Ill. 356, that the petition in a partition suit must make all persons known to hold an interest in, or claim title to, the premises parties to the proceeding, and that a bill for

partition of land must set forth the interests of all parties in·the premises; as the court is required by statute to fix and declare the rights, titles and interests of all parties. And in a case between the same parties reported in 273 Ill., at page 299 we held that under the statute all persons interested in real estate sought to be partitioned have a right in such a proceeding to have all questions of conflicting or controverted titles investigated and determined and all clouds removed from the title of such real estate; that they cannot be deprived of that right, and being made defendants to such bill, they may resort to a cross bill to assert their rights in the premises. When this course is rendered necessary and recourse is had to a cross bill for the purpose of bringing in additional parties and granting affirmative relief as to them respecting the same subject matter involved in the original bill, we think the cross bill is germane to such original bill and properly filed in such case. In the case of *Brill* v. *Green,* 316 Ill. 583, we held the statute requires that every person having any interest in lands, whether in possession or otherwise, who is not a petitioner, shall be made a defendant, and the bill must set forth the interests of all the parties so far as the same are known, including tenants for years, for life, by courtesy or in dower and that upon failure of petitioners to bring in certain parties without whom the case could not be disposed of, a cross bill containing the necessary averments and the necessary parties thereto was proper. In the case of *Winemiller* v. *Mossberger,* 355 Ill. 145, we held that it was permissible to bring in by cross bill persons who are not defendants to the original bill for partition, whether interested as claimants of an adverse interest or otherwise. Under these holdings, the trial court properly permitted the appellees to intervene and file their answer and cross complaint.

It is also contended by appellants that jurisdiction of a proceeding to establish and probate a lost or destroyed

will is vested solely in the county court and that the circuit court has no original jurisdiction. Administration was filed in the county court in this case by the appellant, Minnie Jordan, alleging that Amanda Myers died intestate. The testimony shows that there has been an adjustment day, that there are no debts against the estate, that the funeral expenses have been paid and that a stone has been purchased for the grave of the deceased. The will of Amanda Myers provides, "That in that event, that is, that my husband shall predecease me, she the said Grace M. McGrew, shall pay all of my burial and funeral expenses of probating my will and administering my estate, and also erect a monument at the graves of myself and my said husband, within a reasonable time after my decease." The administrator, W. F. Downard testified that all of these things have been done. There is, therefore, nothing more to do than to make distribution of the estate. We have held that courts of chancery may in the exercise of their general jurisdiction take upon themselves the administration of estates and thus in the case of a particular estate, supersede the jurisdiction of the probate court. Where they do this, they are taking the whole administration in their hands. (*Elting* v. *First Nat. Bank,* 173 Ill. 368.) The early rule has been somewhat modified to the extent that equity will not exercise this jurisdiction and take upon itself the administration of an estate except in extraordinary cases. (*Moore* v. *Brandenburg,* 248 Ill. 232.) However, in the present case, we hold that the facts shown by the record furnish sufficient reasons why the powers of the county court are inadequate to grant all the relief sought, and that the appellant Jordan having filed her petition first in the probate court for letters of administration alleging that Amanda Myers died intestate and later having gone into the circuit court and filed her bill alleging that she and the other heirs of Amanda Myers were the owners in fee simple as tenants in common of her real estate, com-

pelling the appellees to come into the circuit court to protect their equitable rights, the circuit court, having taken jurisdiction in equity, had sufficient power to grant the relief prayed by the cross complaint, and that it was not necessary for the appellees first to resort to the county court to undertake to probate the destroyed will. The circuit court had jurisdiction to order the probate of the will of Amanda Myers and to appoint Dewey McGrew as executor and to order Frank Downard, the present administrator appointed by the county court, to deliver to him all property held by him as such administrator.

The decree of the circuit court is affirmed.

*Decree affirmed.*