# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Zivin*, 2018 IL App (1st) 172883

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF ALMA M. ZIVIN, Deceased (Hebrew University of Jerusalem, Claimant-Appellant, v. Norman Zivin and Sander Allen, Co-Executors of the Estate of Alma M. Zivin, Deceased, and Co-Trustees of the Alma M. Zivin Trust, Dated May 20, 2004, Respondents-Appellees). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2883 |
| Filed | September 13, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-P-06979; the Hon. Susan Coleman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | A. Charles Kogut, of Kogut & Associates, of Oak Brook, for appellant.<br><br>Susan H. Booker, of Levun, Goodman & Cohen, LLP, of Northbrook, for appellees. |

Panel     PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Ellis and Burke concurred in the judgment and opinion.

## OPINION

¶ 1  The issue in this probate action is whether the "Mutual Last Will and Testament" executed by decedent Alma M. Zivin and her husband in 1983 was a joint and mutual will such that its dispositions, including a considerable bequest to claimant Hebrew University of Jerusalem, became irrevocable upon the husband's death in 1984. Alma executed a will in 2004 that did not include a bequest to the school. After her death and the admission of her 2004 will to probate, Hebrew University of Jerusalem filed a claim against her estate, contending she breached a contract with her husband by not providing for the school. On cross-motions for summary judgment, the trial court found that the prior will lacked any language indicating Alma and her husband, Israel, intended it to be an irrevocable contract and also lacked the usual characteristics of a joint and mutual will. On appeal from an order granting summary judgment to the estate, the school contends that the 1983 will contains five common characteristics of a joint and mutual will and that their presence allowed the trial court to find the will was a binding agreement. The estate responds that this is a misstatement of Illinois law.

¶ 2  When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28, 978 N.E.2d 1000. Appellate review of an order granting summary judgment is *de novo*. *Pielet*, 2012 IL 112064, ¶ 30. We begin our review with a summary of the relevant facts and the procedural history of the case.

¶ 3  Alma and Israel's jointly executed will is titled "MUTUAL LAST WILL AND TESTAMENT OF DR. ISRAEL ZIVIN AND ALMA M. ZIVIN." It begins with the statement, "we *** do hereby make, publish and declare this to be our Mutual Last Will and Testament, hereby revoking any and all Wills and Codicils by us at any time heretofore made." In the "FIRST" paragraph, the couple directs that all just debts, funeral expenses, and administration costs "be fully paid out of the principal of our estates."

¶ 4  Israel states in the "SECOND" paragraph: "I *** hereby give, devise and bequeath all of my property whether same may be real, personal or mixed, and wheresoever situated or which I may own or have any interest in at the time of my death, including any lapsed legacies, to my beloved wife, [Alma], for her sole and exclusive use and benefits forever, in the event that I may predecease her." The "THIRD" paragraph is identical to the "SECOND" paragraph, other than switching the names Israel and Alma and the corresponding pronouns. However, if Israel predeceases Alma, she holds back her jewelry and bequeaths it to family members, and it appears she prefers her family members over Israel's. Alma leaves her "Diamond bracelet and flower shaped diamond pin" to "MARTHA YANOFSKY (Sister), of Chestnut Hill, Massachusetts." Alma leaves her "Diamond ring (Approximately 9-1/2 carats)" to "LYNN ZIVIN (Niece), of Chappaqua, New York," and we deduce from the last name that Lynn is Israel's niece. Alma leaves her "Gold watch with diamonds on a background of two gold-plated silver dollars" to "NORMA KATZ (Niece) of Denver, Colorado," but the record

does not disclose whether this niece is one of Israel or Alma's relatives. Alma then says the "Remainder of my jewelry" is "[t]o be divided between my brother, SANDER ALLEN, and my sister, MARTHA YANOFSKY."

¶ 5     The "FOURTH" paragraph empowers and directs the co-executors to liquidate "all of our property, regardless whether real, personal or mixed, as soon after the death of the survivor of us, as they may deem practicable." This is followed by:

> "FIFTH: That in the event that we shall both perish in a common disaster, or following the death of the survivor of us, we give, devise and bequeath the rest, residue and remainder of our estate after payments directed under the above provisions, excluding any property over which we have power of appointment, which [power] we decline to exercise, shall be distributed as follows:
>
> A. 20% thereof to NEAL JAY YANOFSKY of Chestnut Hill, Massachusetts;
>
> B. 10% thereof to DR. SIMON ZIVIN of Lincolnwood, Illinois;
>
> C. 10% thereof to SANDER ALLEN of 990 Lake Shore Drive, Chicago, Illinois;
>
> D. 10% thereof to THE ARK located at 2341 West Devon Avenue, Chicago, Illinois;
>
> E. All of our furniture, furnishings and household effects to SANDER ALLEN and MARTHA YANOFSKY in such shares as they may mutually determine between them;
>
> F. Any remaining property not otherwise effectively disposed of shall be distributed to THE FIRST NATIONAL BANK, as Trustee (hereinafter called 'Trustee'), to be held as a charitable trust for and on behalf of THE HEBREW UNIVERSITY OF JERUSALEM, New York, New York, only, upon the terms and conditions as hereinafter provided.
>
>> 1. The Trustee shall hold said Trust Estate as a charitable trust in perpetuity. The Trustee shall pay the entire net income only, and no part of the principal, of the Trust Estate at least annually to said charitable organization, and that the primary purpose of the said trust is for the higher education of students living in Israel."

The will or other parts of the record on appeal disclose that Neal Jay Yanofsky is the son of Alma's only sister, Martha Yanofsky; Sander Allen is Alma's only brother; and Dr. Simon Zivin predeceased Alma but his surname indicates he was one of Israel's relatives. Thus, like Alma's jewelry, a preference was shown for Alma's relatives over Israel's relatives, in that 30% of the liquidated remainder and 100% of the couple's furniture, furnishings, and household effects is gifted to three of Alma's relatives and only 10% of the liquidated remainder and no other assets are left to Israel's relative, Dr. Simon Zivin. The "SIXTH" paragraph details the powers of the trustee to manage, invest, and distribute the trust created to benefit the school.

¶ 6     In the "SEVENTH" paragraph, Alma and Israel appoint each other as their executors, and in the event of a common disaster or after the death of the second spouse, they appoint Dr. Simon Zivin (Israel's relative) and Sander Allen (Alma's relative) as co-executors.

¶ 7     Israel died in 1984, and later that same year, the 1983 will was filed in the probate division of the circuit court of Cook County.

¶ 8     Twenty years later, Alma executed her own will, in which she expressly revoked any and all prior wills and codicils, made specific bequests of her personal effects, and gave the rest,

residue, and remainder of her estate to a "pour over trust" bearing her name. Alma's 2004 will made no provision for Hebrew University of Jerusalem. The Alma M. Zivin Trust, as amended and restated, also made no provision for Hebrew University of Jerusalem. Thirty years after Israel's death, Alma died in Chicago in 2013, at the age of 95 years. Alma and Israel never had children, and when Alma died, she was survived by her brother Sander, of Chicago, and nine adult nieces and nephews in other parts of the United States. The Alma M. Zivin Trust provided for the distribution of specific gifts to family members totaling $415,000, while leaving the residuary of her trust estate to three Chicago charities. Alma's estate included a Chicago condominium unit located at 1212 North Lake Shore Drive No. 9CS, which sold for $662,000 in 2014, and investments, primarily a William Blair account, which brought the value of her estate to $5.8 million for estate tax purposes.

¶ 9    After Alma's will was filed in the probate division, Hebrew University of Jerusalem filed its claim as the income beneficiary of a charitable trust that Alma and Israel agreed would be established after the death of the second spouse. The school contended it was entitled to 60% of the estate's value. The estate, however, moved for and was granted dismissal on grounds that generally only a trustee has standing to sue third parties on behalf of a trust. *In re Estate of Zivin*, 2015 IL (1st) 150606, ¶ 15, 46 N.E.3d 902. The designated trustee was unwilling to bring the school's claim and the school had filed its own claim on what it believed was the last possible day under the statute of limitations. *Zivin*, 2015 IL (1st) 150606, ¶ 18. On appeal, we vacated the dismissal order and remanded for an evidentiary hearing as to whether the designated trustee, a trustee *ad litem* appointed to pursue the school's claim, or the school itself was the proper plaintiff, or whether the claim should be dismissed. *Zivin*, 2015 IL (1st) 150606, ¶ 26. After the evidentiary hearing, the trial court permitted the school to proceed in its own name, and the parties next filed the cross-motions which led to this second appeal.

¶ 10    We have jurisdiction pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016) because the trial court order dated October 18, 2017, granting summary judgment to the estate as to the school's claim, was a final and appealable judgment order and the school filed its notice of appeal within 30 days on November 14, 2017. The trial court's ruling was based entirely on the language of the will, as no other evidence was offered, such as testimony from the drafting attorney or family members as to Alma and Israel's circumstances when they executed their joint will in 1983.

¶ 11    Hebrew University of Jerusalem contends that as long as testators include the common characteristics of a joint and mutual will, the most crucial of which is a common dispositive scheme, a court may infer that the testators intended to enter into a joint and mutual will and that the survivor cannot effectively provide for a contrary disposition. The school cites numerous opinions for the proposition that each case must be decided on its own facts; cites *Curry*, *Edwards*, and *Weaver* for the proposition that a common dispositive scheme is the crucial marker of a joint and mutual will; and relies on *Schwebel* and *Helms* for the proposition that the presence of the common characteristics alone allows a court to find that an irrevocable contract was intended and binds the surviving spouse to the specified bequests. *Curry v. Cotton*, 356 Ill. 538, 191 N.E. 307 (1934); *In re Estate of Edwards*, 3 Ill. 2d 116, 120 N.E.2d 10 (1954); *In re Estate of Weaver*, 71 Ill. App. 2d 232, 217 N.E.2d 326 (1966); *In re Estate of Schwebel*, 133 Ill. App. 3d 777, 479 N.E.2d 500 (1985); *Helms v. Darmstatter*, 34 Ill. 2d 295, 215 N.E.2d 245 (1966). The school concludes that Alma is estopped from altering the fifth article of her contract with Israel.

¶ 12    We agree with the school that whether a proffered document can be deemed an enforceable joint and mutual will is to be determined on a case-by-case basis. *Rauch v. Rauch*, 112 Ill. App. 3d 198, 200-01, 445 N.E.2d 77 (1983). However, as discussed below, we find that the remainder of the school's argument is incorrect and unpersuasive and that Alma was empowered to revoke her 1983 will and free to dispose of her assets as she saw fit.

¶ 13    The terms "mutual will" and "joint will" are sometimes used incorrectly by testators. *Curry*, 356 Ill. at 543. Nevertheless, the meaning of these legal terms is well established. A joint will is a single instrument that contains the wills of two or more persons and disposes of property that they own jointly, in common, or in severalty. *Platz v. Walk*, 3 Ill. 2d 313, 316, 121 N.E.2d 383 (1954); *Frazier v. Patterson*, 243 Ill. 80, 84-85, 90 N.E. 216 (1909). A joint will may be probated on the death of each maker as his or her will. *Curry*, 356 Ill. at 543; *Frazier*, 243 Ill. at 84. A joint will may or may not also be a mutual or reciprocal will. *Frazier*, 243 Ill. at 84; *Platz*, 3 Ill. 2d at 316. A joint will that is not reciprocal is simply the individual personal will of each of the persons executing the document and is subject to the same rules that would apply if the wills were several. *Frazier*, 243 Ill. at 84.

¶ 14    Mutual or reciprocal wills are the separate wills of two or more testators that contain reciprocal terms such that each testator makes disposition of his or her respective property in favor of the other. *Frazier*, 243 Ill. at 84; *Curry*, 356 Ill. at 543; *Platz*, 3 Ill. 2d at 316.

¶ 15    A will that is both joint and mutual is a jointly executed document with reciprocal terms and shows on its face that the bequests are made in consideration of the other. *Platz*, 3 Ill. 2d at 316-17; *Curry*, 356 Ill. at 543; *Frazier*, 243 Ill. at 84. A joint and mutual will becomes irrevocable upon the death of the first spouse "on the theory that the first that dies carries his part of the contract into execution. In such case the courts will not permit the other party to afterwards break the contract." *Frazier*, 243 at 85. It is the contract between the testators that renders a joint will irrevocable and estops the survivor from disposing of the property other than as provided in the will. See, *e.g.*, *Frazier*, 243 Ill. at 84-85; *Curry*, 356 Ill. at 546; *In re Estate of Erickson*, 363 Ill. App. 3d 279, 282, 841 N.E.2d 1104 (2006); *Rauch*, 112 Ill. App. 3d at 200.

¶ 16    The contract to mutually dispose of the property may be verbal, may be contained in a separate document, or may be embodied in the will itself. See *In re Mueller's Estate*, 26 Ill. App. 3d 163, 165, 324 N.E.2d 674 (1975) (existence or non-existence of an irrevocable contract is to be gathered from the terms of the will and evidence of the surrounding circumstances). Regardless of where it is located, the agreement must be certain and definite, founded upon adequate consideration, and established by clear and convincing evidence. *Jordan v. McGrew*, 400 Ill. 275, 280 (1948). In *Basich*, for example, the drafting attorney testified that the testators told her that if one of them survived, the other would not change their joint will. *In re Estate of Basich*, 79 Ill. App. 3d 997, 1003, 398 N.E.2d 1182 (1979). In the instant case, however, there was no testimony about the drafting or execution of the 1983 will; no testimony about Alma and Israel's families and close friends; and no testimony suggesting that Alma and Israel had such a close connection to Hebrew University of Jerusalem that the couple would not make a bequest to the school but also agree to make it an irrevocable bequest. Accordingly, we will be considering the 1983 will in light of cases such as *Orso* and *Flemming*, discussed below, which analyzed the testators' written wills. *Orso v. Lindsey*, 233 Ill. App. 3d 881, 598 N.E.2d 1035 (1992); *Moline National Bank v. Flemming*, 91 Ill. App. 3d 398, 414 N.E.2d 936 (1980).

¶ 17    In a previous era, a married couple's joint will with reciprocal provisions would create a presumption that the will was mutual—that is, executed pursuant to a contract not to revoke the dispositions. See *Frazier*, 243 Ill. at 86-87 (filed in 1909). In 1954, however, about 29 years before Alma and Israel executed their 1983 will, the Illinois Supreme Court surveyed Illinois precedent and came to the conclusion that the trend was for courts to search the language of a will for indications that it was executed pursuant to a binding contract to be irrevocable. *Estate of Edwards*, 3 Ill. 2d at 122; see also *In re Estate of Signore*, 149 Ill. App. 3d 904 (1986) (although it has been stated that a joint will between husband and wife raises a presumption that the will was executed pursuant to a contract not to revoke, later decisions have been reluctant to allow the presumption to be sufficient in itself). We are to read the document as a whole and consider the relevant circumstances of the testators and beneficiaries to determine the testators' intent and the extent of their agreement, if any, that the will was executed pursuant to a contract not to revoke. See, *e.g.*, *Schwebel*, 133 Ill. App. 3d at 783-84 (determination that the joint will of two brothers was irrevocable was based on presence of common characteristics of a joint and mutual will and the fact that the testators were "notoriously close in terms of trust and affection" and chose to dispose of their estates by a joint document); see also *Joint or Mutual Wills*, 61 Harv. L. Rev. 675, 679 (1948) ("The provisions and expressions contained in the wills, and the relationship of the testators between themselves and with the ultimate beneficiaries, have often been considered factors of evidential value [in determining whether an irrevocable bargain was reached].").

¶ 18    The party asserting a joint and mutual will has the burden of establishing the contract by clear and convincing evidence. *Jacoby v. Jacoby*, 342 Ill. App. 277, 283, 96 N.E.2d 362, 365 (1950) (burden of proof is on the party asserting the existence of the contract, and he must establish that the will is contractual as well as testamentary in character; this burden is not sustained by proof which permits an inference either way); *Tontz v. Heath*, 20 Ill. 2d 286, 291, 170 N.E.2d 153, 156 (1960) (burden is on the party asserting such a contract to establish it by clear and convincing evidence). "Clear and convincing evidence is that quantum of proof which leaves no reasonable doubt in the mind of the trier of fact of the truth of the fact in issue." *In re Estate of Weaver*, 75 Ill. App. 2d 227, 229, 217 N.E.2d 326, 322 (1966). Clear and convincing is a higher standard of proof than mere predominance of the evidence and has also been described as evidence "which leaves the mind well satisfied of the truth of a proposition," "strikes all minds alike as being unquestionable," or "leads to but one conclusion." *In re Estate of Ragen*, 79 Ill. App. 3d 8, 13-14, 398 N.E.2d 198 (1979).

¶ 19    Hebrew University of Jerusalem relied entirely on the will and offered no other evidence. The trial court considered the terms contained in the four corners of the 1983 will to determine whether Alma and Israel contracted to execute a joint and mutual will and found that it lacked any indication of a binding agreement. Our *de novo* review also leads us to find that the 1983 will does not constitute a contract between the parties that estopped Alma from disposing of the property in some other way.

¶ 20    The will at issue in *Orso* was drafted in 1960. *Orso*, 233 Ill. App. 3d 881. Marion and Charles expressly stated they were executing their " 'joint and mutual last will and testament.' " *Orso*, 233 Ill. App. 3d at 883. After setting out their common plan to dispose of their assets, Marion and Charles concluded, " 'This joint and mutual will is made in pursuance of a contract or agreement between us for the disposition of all of our property, whether owned by us as joint tenants or as tenants in common, in the manner hereinabove, in this, our last will

and testament ***.' " *Orso*, 233 Ill. App. 3d at 885. Hebrew University of Jerusalem, which bore the burden of producing clear and convincing evidence, has not pointed to any comparable language in the Orsos' 1960 will and the Zivins' 1983 will.

¶ 21    We contrast Alma and Israel's language with the *Flemming* joint and mutual will, which was written in 1966. *Flemming*, 91 Ill. App. 3d at 400. The testators stated in relevant part:

> " 'We, Albert Flemming and Eva K. Flemming, *** do each mutually in consideration of the other making this Will, and the provisions made herein by each of us in favor of the other, make, publish and declare this to be our Last Will and Testament, intending to provide herein for the ultimate disposition of all of our property, be it in joint tenancy, tenancy in common or in our individual names, and we agree that the same cannot be changed or varied without the consent in writing of the other ***.' " *Flemming*, 91 Ill. App. 3d at 400.

The Flemmings expressly referred to the consideration necessary to make an agreement a binding agreement, acknowledged that the provisions were reciprocal, specified they were agreeing to the "ultimate disposition" of all their property, and also stated that the terms could not be changed without the written consent of the other spouse. The Flemmings buttressed their clear and binding language by also signing and attaching to their joint and mutual will an independent contract, in which they stated:

> "CONTRACT TO EXECUTE JOINT LAST WILL AND TESTAMENT
>
> This contract, made and executed, in duplicate, this 7th day of February, 1966, between ALBERT FLEMMING, party of the first part, and EVA K. FLEMMING, party of the second part.
>
> WITNESSETH
>
> Whereas, the parties hereto do desire to duly execute a joint Last Will and Testament, which disposes of their respective estates in accordance with their individual desires and mutual agreement and which said joint will is dated and being executed concurrently with this contract; and
>
> Whereas, they desire to make certain that said joint Last Will and Testament cannot be changed, varied, altered or revoked by either of them without the consent in writing of the other, or as provided in the following paragraph.
>
> Now, therefore, in consideration of the premises and the execution by each of the parties hereto of said joint Last Will and Testament dated and executed concurrently with this contract, the parties hereto do agree for themselves, their respective heirs, devisees and assigns that said joint Last Will and Testament will not be changed, varied, altered or revoked by either of them without the consent in writing of the other. In the event our marriage to each other should terminate by divorce or annulment, this contract shall then be automatically cancelled and be of no further force or effect whatsoever.' " *Flemming*, 91 Ill. App. 3d at 401.

¶ 22    The Flemmings' words clearly and convincingly state that they are irrevocably bound to the bequests they make in their will, unless they mutually agree to a modification or revocation or their marriage ends. The Flemmings drafted and executed these terms in 1966, almost 17 years before the Zivins drafted and executed their will in 1983, and the *Flemming* opinion was published in December 1980, more than two years before the Zivins wrote and signed their will in January 1983. Hebrew University of Jerusalem, however, which bore the burden of

producing clear and convincing evidence, has not pointed to any comparable language in the *Flemming* and Zivin wills.

¶ 23　　The testator in *Aimone*, Edith, was a contemporary of the Zivins who executed her will in May 1984, shortly after the Zivins executed their will in January 1983. *In re Estate of Aimone*, 226 Ill. App. 3d 1057, 1058-59, 590 N.E.2d 94 (1992). Edith stated:

> " 'I have made this Last Will and Testament pursuant to a contract and agreement between my husband and me for the purpose of disposing of all our property, whether owned by us as joint tenants, as tenants in common or in severalty, in accordance with a common plan. The reciprocal and other gifts made herein are in fulfillment of this purpose and plan and in consideration of each waiving the right, during our joint lives, to alter, amend or revoke our respective and mutual Last Wills and Testaments, in whole or in part, by Codicil or otherwise, without notice to the other, or under any circumstances after the death of the first of us to die.' " *Aimone*, 226 Ill. App. 3d at 1058-59.

Edith not only referred to a " 'contract and agreement,' " she also indicated there was a " 'common plan' " and specified that the bequests were made in furtherance of that " 'purpose and plan' " and could not be unilaterally changed without notice to her husband during their lifetimes and not at all after his death. *Aimone*, 226 Ill. App. 3d at 1058-59. Alma and Israel's 1983 will, however, does not include any language limiting either spouse's right to unilaterally revoke or otherwise change the bequests.

¶ 24　　Illinois precedent does not require that testators make an express reference to a contract or execute a separate contract to support their will. However, the later-cited authority illustrates the clear and certain language that some testators have used to express their intention to enter into irrevocable dispositions.

¶ 25　　Hebrew University of Jerusalem relies heavy on *Helms*, in which George and Lena executed a will that did not expressly refer to a contract between them, but the court found it otherwise clearly indicated that they entered into a binding agreement providing for the disposition of their estates upon the death of each of them and upon the death of the survivor of them. *Helms*, 34 Ill. 2d at 298-99. We do not find *Helms* particularly relevant, given that George and Lena's will was drafted in 1947, about 40 years prior to Alma and Israel's will in 1983, when it could still be presumed from the fact that testators were married that they intended for their will to be not only joint but mutual. See *Frazier*, 243 Ill. at 86-87; *Estate of Edwards*, 3 Ill. 2d 122; *Schwebel*, 133 Ill. App. 3d at 783. In any event, George and Lena stated in part as follows:

> " 'We, GEORGE LORTZ and LENA LORTZ, of the County of St. Clair and State of Illinois, being of sound mind and memory, do hereby make, publish and declare this is be our Joint Last Will and Testament, hereby revoking and making void all former wills by us or either of us at any time heretofore made.
>
> 　　　　　　　　　　* * *
>
> FIFTH: We respectively hereby give, devise and bequeath, all the rest, residue and remainder of our property, both real and personal of whatsoever kind or nature, which we or either of us now own or may hereafter acquire and wherever located and which shall remain after the payment of all claims and bequests against our respective estates, to the survivor of us, as his or her absolute property forever.

SIXTH: After the death of the survivor of either of us or in case of the death of both of us at the same time, we respectively order and direct that the residue of our estates be merged into one Corpus, by reducing all of our property, both real and personal, into cash and for that purpose we respectively authorize our Executors to convert the same, by selling all our Real Estate and tangible property, within Two (2) years after our deaths, or the death of the survivor of us, and execute proper deeds to the purchasers thereof, and pay the expenses of evidences of title and the preparation of deeds and if necessary, in their judgment, employ a surveyor and legal counsel to protect the interest held by us at our deaths, and after all of our property, both real and personal, has been reduced and converted into cash and all the debts, claims, and charges against our estates, including taxes and costs of Administration have been paid in full, we hereby order and direct our Executors to pay out of the remainder of said Corpus, the sums of money hereinafter set forth, and we hereby give and bequeath, as follows:

* * *

SEVENTH: In case there still remains a surplus or residue in the Corpus of our estates after the legacies and bequests hereinbefore provided for and all other charges and expenses connected with the settlement of our estates have been paid out and satisfied, we hereby order and direct that such surplus or residue be divided among all of the legatees mentioned in this Will in the same proportion and at the same ratio, that the specific bequests hereinbefore made, bear to the remainder or residue of said Corpus.' " *Helms*, 34 Ill. 2d at 298-99.

¶ 26    Looking at all the circumstances, the trial court found that the George and Lena had intended a joint and mutual will. *Helms*, 34 Ill. 2d at 301. Although each case must be viewed individually, there are generally five common features of a joint and mutual will. The testators of a joint and mutual will (1) label their will as such, (2) include reciprocal provisions which dispose of the entire estate in favor of the other testator, (3) pool their interests or merge their estates into a common corpus, (4) have a common dispositive scheme under which they dispose of the common fund by bequeathing it approximately equally to each side of the family, and (5) use plural pronouns and terms such as "we give" and "our estate." *Rauch*, 112 Ill. App. 3d at 200-01 (presence of all five characteristics clearly indicated that a husband and wife intended for their jointly executed will to be a joint and mutual will). Other courts expand on this list of five factors to also consider whether the testators expressly agreed that no revocation could be made without the consent of the other testator and whether the testators limited the survivor's use of the property. *Signore*, 149 Ill. App. 3d at 906 (concluding that a joint will was not a joint and mutual will, rendered irrevocable by the death of the first spouse, due to clause stating that a document was the couples' " 'Last Will and Testament, with full reservation by both or either of us to change the terms hereof at any time' "); *Larison v. Record*, 117 Ill. 2d 444, 450, 512 N.E.2d 1251 (1987) (testator's intent is to be determined from the evidence, no language in unambiguous will limited survivor's right to make a new will, and court would not guess or speculate whether the testator intended a different disposition); *Mueller*, 26 Ill. App. 3d 163 (the joint will or other evidence must indicate the testators agreed the disposition could not be revoked without the other's consent, include the mutuality of promises or reciprocal consideration, merge both estates into one corpus, and limit the use of the property by the surviving spouse).

¶ 27 Hebrew University of Jerusalem incorrectly argues that a common dispositive scheme is the crucial feature of a joint and mutual will. The school relies on *Curry*, 356 Ill. 538, *Edwards*, 3 Ill. 2d 116, and *Weaver*, 71 Ill. App. 2d 232, which do not support this conclusion; moreover, the school is incorrectly stating the characteristic. Courts, including *Helms*, have looked for a common dispositive scheme under which the testators dispose of the common fund *by bequeathing it approximately equally to each side of the family*. *Rauch*, 112 Ill. App. 3d at 200-01; *Signore*, 149 Ill. App. 3d at 906.

¶ 28 Hebrew University of Jerusalem misconstrues *Helms*, when it argues that Alma and Israel's joint will is similar to George and Lena's will and expresses a contract or agreement between them that the bequests they intended in 1983 became irrevocable upon Israel's death in 1984. George and Lena both executed their joint will, and purported to dispose of property that they owned jointly, in common, or severally. Each made a disposition of his or her entire estate in favor of the other, stating "We respectively hereby give, devise and bequeath, all the rest, residue and remainder of our property*** to the survivor of us, as his or her absolute property forever." However, in the next clause George and Lena merged both estates into a common corpus and then jointly directed that the corpus be divided equally between their families so that George's 18 relatives received approximately the same amount of Lena's 19 relatives. Thus, George and Lena's will "shows on its face that the bequests [were] made one in consideration of the other." *Curry*, 356 Ill. at 543. Alma and Israel, however, had a different arrangement.

¶ 29 Their will was titled "MUTUAL LAST WILL AND TESTAMENT OF DR. ISRAEL ZIVIN AND ALMA M. ZIVIN" and is not labeled as the joint and mutual will of the testators.

¶ 30 The SECOND and THIRD paragraphs are not reciprocal provisions, in that Israel makes a disposition of all of his property to Alma, but Alma conditions the disposition of her estate on Israel's survival and otherwise holds back valuable assets primarily for the benefit of her family members. In the event Israel predeceases her, Alma reserves all of her jewelry, makes bequests of three specific pieces, and gives 100% of her remaining jewelry to her brother and sister.

¶ 31 In the FOURTH and FIFTH paragraphs, Alma and Israel pool their estates, but they do not make reciprocal or identical dispositions to their respective sides of the family. What is left after the disposition of the Alma's jewelry is merged together, and this pooled estate is divided unequally between the two sides of the family. Fully 30% of the remainder is carved out for Alma's relatives and 100% of the furniture, furnishings, and household effects is left to Alma's brother and sister. Only 10% of the corpus is left to Israel's relative. Another 10% is earmarked for The Ark and any remaining property not already effectively disposed of is left to Hebrew University of Jerusalem. Thus, although there is pooling, there is no common dispositive scheme under which Alma and Israel dispose of a common fund by bequeathing it to their heirs in approximately equal shares. Alma's bequest to Israel is conditional and, regardless of which spouse dies first, Alma's side of the family is to receive a much larger percentage of the estate than Israel's side of the family. The will does not "show[ ] on its face that the bequests [were] made one in consideration of the other." *Curry*, 356 Ill. at 543. If the unequal bequests are attributable to other facts, such as an attempt to balance prior gifts that favored Israel's heirs, Hebrew University of Jerusalem failed to make those facts part of the record.

¶ 32 We also look for the use of common plural terms such as "we" and "our" as further indications of the testators' intent to make a joint and mutual will. Alma and Israel did

- 10 -

frequently use "we" and "our," and they appointed each other as the executor. In the event of a common disaster or after the death of the second spouse, they jointly appointed one of his family members and one of her family members (Dr. Simon Zivin and Sander Allen) to act as joint executors. The frequent use of "we" and "our" is not sufficient reason for us to infer that Alma and Israel intended their will to be irrevocable.

¶ 33      There is no language, one way or another, specifying that the surviving spouse maintained the right to revoke the will or otherwise modify its bequests.

¶ 34      There is no express indication that the surviving spouse was given only a life estate or impliedly restricted from disposing of any assets. To the contrary, in the SECOND and THIRD paragraphs, each of the spouses gives all of their property, absolutely, to the other, in perpetuity. Each resolved to "give, devise and bequeath all of my property whether same may be real, personal or mixed, and wheresoever situated or which I may own or have any interest in at the time of my death, including any lapsed legacies, to my beloved *** for [his or her] sole and exclusive use and benefits forever, in the event that I may predecease [him or her]."

¶ 35      We find no significance in the fact that the testators' signature lines conclude with the word "(SEAL)." The school's reliance on this single word is misplaced because this is not an instance like *Curry* in which the surviving testator expressly "covenanted" to make certain bequests and the court concluded this stipulation meant "the instrument is under seal." *Curry*, 356 Ill. at 547.

¶ 36      Reading Alma and Israel's 1983 will as a whole, we conclude it lacks contracting terminology and does not include the typical defining characteristics of an irrevocable agreement to provide for the ultimate disposition of their estates. All in all, we cannot say that the terms of the 1983 will preclude the surviving testator from revoking the document and creating a new plan.

¶ 37      Hebrew University of Jerusalem also misconstrues *Edwards*, 3 Ill. 2d at 116. During oral arguments, the school contended that the *Edwards* will mirrored Alma and Israel's 1983 will. We disagree. The *Edwards* will expressed the couple's agreement that the surviving spouse would have the use and enjoyment of certain assets only "during his or her lifetime," that the survivor could not "sell any of the real estate owned by the other during his or her life," and that a woman who had lived with and cared for the couple for more than 10 years, was to have everything upon the death of the surviving spouse. *Edwards*, 3 Ill. 2d at 117-18. There are no such restrictions in Alma and Israel's 1983 will.

¶ 38      We conclude that Hebrew University of Jerusalem has failed to establish a fact necessary for its claim—that Alma was bound by a contract with Israel that required her to maintain the dispositions stated in the joint will. Alma and Israel's 1983 will does not communicate their intent to enter into a joint and mutual will such that Alma could not subsequently revoke the 1983 will and execute her own plan in 2004, which did not provide for Hebrew University of Jerusalem. Accordingly, we affirm the entry of summary judgment against Hebrew University of Jerusalem and in favor of the estate as to the school's claim that it was entitled to enforce the terms of the 1983 will.

¶ 39      Affirmed.